UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x   Docket No.: 3:22-cv-00033(KAD)
MURPHY MEDICAL ASSOCIATES, LLC;            :
DIAGNOSTIC AND MEDICAL SPECIALISTS   :   **AMENDED COMPLAINT**
OF GREENWICH, LLC; and STEVEN A.R.        :   **JURY TRIAL DEMANDED**
MURPHY, M.D.,                                            :
                                                                    :
                              Plaintiffs,                      :
            vs.                                                 :
                                                                    :
YALE UNIVERSITY and YALE HEALTH PLAN :
                                                                    :
                                                                    :
                              Defendant.                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

Plaintiffs Murphy Medical Associates LLC, Diagnostic and Medical Specialists of Greenwich, LLC (collectively, the "Murphy Practice" or "Plaintiffs") and Steven A.R. Murphy, M.D. ("Dr. Murphy"), by their attorneys, Harris Beach, PLLC, for their Amended Complaint against the Defendants, Yale University and Yale Health Plan (collectively, "Yale"), allege as follows.

## **INTRODUCTION**

1.      Plaintiffs bring this case because Yale, one of the most prominent universities in the United States, is blatantly defying federal and state law, as well as principles of equity, by refusing to reimburse Plaintiffs for COVID-19 testing that Plaintiffs provided to members and/or beneficiaries of Yale's self-funded health plans that Yale offers and administers to students, faculty and/or other eligible Yale affiliates.

2.      In 2020, and in response to the COVID-19 pandemic and public health emergency, Congress twice passed statutes – the Families First Coronavirus Response Act (FFCRA) and the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) – requiring all fully-insured,

1

level-funded, and self-insured health plans, including Yale, to cover such COVID-19 tests and related services, regardless of whether they are provided by in-network or out-of-network providers. Such coverage must be complete: copayments, deductibles, coinsurance and limits on coverage are not permitted.

3.      The United States has experienced five waves of the pandemic since 2020, including three in an 18-month interval that were driven by new variants: Alpha, Delta, and Omicron. As stated in President Joseph Biden's National COVID-19 Preparedness Plan, the country is now focused on four goals: protect against and treat COVID-19; prepare for new variants; prevent economic and educational shutdowns; and continue to vaccinate the world.

4.      The Murphy Practice has and will continue to provide critical COVID-19 testing and related services to uphold its Hippocratic Oath during this public health crisis.

5.      Yale, however, has refused to honor federal and state law and, instead, has issued outright denials or infinitesimal "reimbursement" of claims submitted by the Murphy Practice. The Murphy Practice has appealed every claim submitted to Yale, which were summarily denied and later advised to the Murphy Practice that it has exhausted all appeal rights.

6.      Plaintiffs, therefore, are left with no recourse against Yale other than through this Court to hold Yale accountable for its wrongful conduct during the current public health crisis.

**PARTIES**

7.      At all times relevant to this matter, Plaintiff Murphy Medical Associates LLC is a limited liability company organized under Connecticut law. Its principal place of business is located at 30 Buxton Farms Road, Stamford, Connecticut 06905.

8.      At all times relevant to this matter, Plaintiff Diagnostic and Medical Specialists of Greenwich, LLC is a limited liability company organized under Connecticut law. Its principal place of business is located at 30 Buxton Farms Road, Stamford, Connecticut 06905.

9.     At all times relevant to this matter, Plaintiff Steven A.R. Murphy, M.D. ("Dr. Murphy") is a physician licensed to practice medicine in Connecticut and New York. His principal place of practice is located at 30 Buxton Farms Road, Stamford, Connecticut 06905.

10.     Dr. Murphy, a board-certified internist, is the principal of the Murphy Practice.

11.     Dr. Murphy completed his internship in medical genetics and pediatrics at Mount Sinai Hospital in New York. He subsequently served as the Chief Resident for Internal Medicine at Greenwich Hospital-Yale New Haven Health in Greenwich, Connecticut from July 2007 through May 2008. Prior to entering private practice, Dr. Murphy also served as a clinical fellow in medical genetics at Yale Medical School in New Haven, Connecticut from June 2008 until November 2008.

12.     As a physician, Dr. Murphy specializes in general medical care, personalized medicine and genetics, weight loss medicine, adolescent care, and hereditary cancers. In addition, Dr. Murphy is an FAA Senior Aviation Medical Examiner, a United States Civil Surgeon, and an obesity medicine specialist.

13.     Dr. Murphy also serves as an assistant professor of medicine, cell biology, and anatomy at New York Medical College in Valhalla, New York.

14.     Dr. Murphy is the certified laboratory director for Plaintiff Diagnostic and Medical Specialists of Greenwich, LLC under the federal Clinical Laboratory Improvement Amendments ("CLIA") and Connecticut law.

15.     Upon information and belief, Defendant Yale University is private research university located in New Haven, Connecticut.

16.     Yale University runs Yale Pathology Labs ("YPL") through the Yale School of Medicine. In the early stages of the pandemic, YPL continuously sought to collaborate with the

Murphy Practice, utilizing the Murphy Practice's samples, data and research to further their own COVID-19 testing procedures.

17.     Upon information and belief, Yale offers various health plans to students, faculty and other Yale affiliates through Defendant Yale Health Plan that it administers as a self-funded payer ("SFP") because it pays the costs of health care services provided by healthcare providers to its members and/or beneficiaries out of its own funds.

18.     Upon information and belief, Yale Health Plan administers and manages Yale's health plans to members of the Yale community with its principal place of business located at 55 Lock Street, New Haven, Connecticut 06520.

19.     As an SFP, Yale acts in a role similar to commercial health insurers by reimbursing providers for services provided to patients covered by Yale's health plan(s).

20.     Upon information and belief, Yale is affiliated with Yale New Haven Health Systems in support of patient care, medical education and clinical research.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this dispute under 28 U.S.C. § 1331 because the Murphy Practice asserts federal claims against Yale under ERISA.

22.     This Court also has personal jurisdiction over Yale because Yale carries on one or more businesses or business ventures in this judicial district; there is the requisite nexus between the businesses and this action; and Yale engages in substantial, and not isolated, activity within this judicial district.

23.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial portion of the events giving rise to this action arose in this District.

## RELEVANT FACTS

24.     At the start of the COVID-19 pandemic, the Murphy Practice – a cutting edge internal and preventative medical practice based in southwestern Connecticut – was one of the first (if not the first) to answer the call of towns and institutions throughout Fairfield and New Haven Counties, Connecticut, and Westchester County, New York about the desperate need for timely COVID-19 testing.

25.     Formed by Dr. Murphy over a decade ago, the mission of the Murphy Practice is to provide high-quality preventive and general health services, as well as acute primary care, to men, women, and adolescents. Dr. Murphy, a board-certified internist, is the principal of the Murphy Practice.

26.     The Murphy Practice accomplishes its mission by offering an array of preventive medical services, including diagnostic laboratory testing and imaging such as ultrasounds and echocardiograms.

27.     Patients of the Murphy Practice can also receive care and consultations concerning a myriad of other services, including allergy testing, testosterone therapy, chronic disease management, gynecology, immigration physicals, medical marijuana, vitamin therapy, vein evaluation, urgent care and weight loss.

28.     Dr. Murphy completed his internship in medical genetics and pediatrics at Mount Sinai Hospital in New York. He subsequently served as the chief resident in internal medicine at Greenwich Hospital-Yale New Haven Health in Greenwich, Connecticut. Prior to entering private practice, Dr. Murphy also served as a clinical fellow in medical genetics at Yale Medical School in New Haven, Connecticut.

29.     As a physician, Dr. Murphy specializes in general medical care, personalized medicine and genetics, weight loss medicine, adolescent care, and hereditary cancers. In addition, Dr. Murphy is an FAA Senior Aviation Medical Examiner, a United States Civil Surgeon, and an obesity medicine specialist.

30.     Dr. Murphy serves as an assistant professor of medicine, cell biology, and anatomy at New York Medical College in Valhalla, New York.

31.     Among its other services, the Murphy Practice operates a state-licensed physician office laboratory located at 30 Buxton Farms Road in Stamford, Connecticut.  Dr. Murphy is the certified laboratory director for this laboratory under the federal Clinical Laboratory Improvement Amendments ("CLIA") and Connecticut law.

## THE MURPHY PRACTICE'S COVID-19 RESPONSE

32.     In response to the COVID-19 pandemic, beginning on or about March 9, 2020, the Murphy Practice determined that there was a need for high-quality and efficient COVID-19 testing and related services throughout southwestern Connecticut and the Hudson Valley.  Following the guidance of the CDC as well as evidence-based and peer-reviewed studies by infectious disease experts, the Murphy Practice developed a comprehensive testing protocol, investing over $1 million in setting up drive and/or walk-through COVID-19 testing sites in both Connecticut and New York.

33.     Ultimately, the Murphy Practice operated drive and/or walk-through COVID-19 testing sites in Greenwich, Stamford, New Canaan, Darien, Fairfield, Bridgeport, New Haven, West Haven, Stratford, and Ridgefield, Connecticut, and Bedford, Brooklyn, and Pound Ridge, New York.

34.     In addition to creating the physical infrastructure for the sites, the Murphy Practice had to assemble the clinical and administrative staff needed to operate the sites and to perform the testing, including physicians, medical students, physician assistants, nurse practitioners, registered nurses, medical assistants, registrars, coordinators, and IT staff. It had to develop extensive protocols and procedures to ensure the sites were effectively and efficiently operating, and all safety, infection control, OSHA, and CDC guidance were observed.

35.     The Murphy Practice also invested significant hours and resources researching peer-reviewed and other expert literature to determine the most effective and informative way to fulfill its COVID-19 testing mission.

36.     Through this research, and based on personal experience, the Murphy Practice concluded that performing a COVID-19 test in a vacuum, without performing any other diagnostic testing, would fail to adhere to the requisite standard of care. Thus, patients who present with symptoms of COVID-19, or patients who have or potentially have exposure to COVID-19, need to be tested for COVID-19 as well as other respiratory viruses and infections that could possibly cause the same or similar symptoms as COVID-19, or could possibly co-exist with COVID-19. Information about other potential respiratory viruses or infections is vitally important to ensure that patients who present with symptoms or were possibly exposed to COVID-19 receive the most appropriate and effective treatment for a life-threatening condition.

37.     Medical Studies have also concluded that a statistically significant percentage of patients (20% in one study) who tested positive for COVID-19 also tested positive for one or more respiratory pathogens.

38.     In particular, FAQs regarding the federal COVID-19 testing law that have been prepared jointly by the Departments of Labor, Health and Human Services (HHS), and the Treasury (collectively, "FAQs"), state that "the CDC strongly encourages clinicians to test for other causes of respiratory illnesses."

39.     As a result, when testing for COVID-19 among symptomatic patients the Murphy Practice also tested for other respiratory pathogens.

40.     Initially, this was accomplished by splitting the samples taken from patients and sending one sample to a lab with the capability to test for COVID-19, and one sample to the Murphy Practice lab, which was able to test for non-COVID respiratory viruses, but did not yet have the capacity to test for COVID-19.  The Murphy Practice utilized a BioFire Film Array Panel test for its COVID-related respiratory virus testing.

41.     These Panels are front-line tests to help clinicians quickly and accurately diagnose numerous respiratory infections, which present with nearly indistinguishable symptoms and contribute to a significant healthcare burden. These multiplex PCR respiratory panels utilize a syndromic approach to target a broad grouping of probable respiratory pathogens.

42.     After months of working unsuccessfully to obtain the equipment necessary to directly provide COVID-19 testing, in May of 2020 an advanced BioFire Film Array System, with COVID-19 testing capability, was approved by the FDA for COVID-19 testing.   The Murphy Practice was able to purchase the new BioFire machine.

43.     According to the makers of BioFire, "[t]he inclusion of SARS-CoV-2 in the BIOFIRE® RP2.1 panel allows healthcare providers to quickly identify patients with common respiratory pathogens, as well as those with COVID-19, using one simple test. The BIOFIRE® RP2.1 panel takes approximately 45 minutes and tests nasopharyngeal swab samples in transport media."

44.     The new BioFire machines are not capable of running a test limited to the detection of COVID-19.  They are only capable of running an enhanced 21 channel PCR BioFire test that detects COVID-19, as well as other common respiratory virus and bacterial infections.

45.     The BioFire machine was an extraordinary advance, and it enabled the Murphy Practice to test far more efficiently.  BioFire is capable of producing COVID-19 test results on the same day a sample was taken, as opposed to commercial labs in Connecticut, where results could take a week to 10 days.  For symptomatic patients, the time difference was potentially lifesaving.

46.     Once the Murphy Practice had COVID-19 testing capacity through the BioFire machines, patients who were symptomatic or otherwise had a need for expedited results had their samples run through BioFire, which often provided them with results in one day or less.  For others, the samples were sent to an outside lab that did the COVID-19 testing.

47.     On March 17, 2021, the BioFire 2.1 became the first COVID-19 test to upgrade from an emergency use authorization to fully approved by the FDA.

48.     The Murphy Practice also provided COVID-19 antibody blood testing in its lab for patients who knew or had reason to believe they had recovered from the virus.  When medically appropriate, those patients who had tested positive for COVID-19 or COVID-19 antibodies were assessed via additional blood testing to determine whether any damage had been done to the body's organs, tissues, or systems, including indicators of a SARS-CoV-2 reinfection or post-COVID-19

conditions also termed "long Covid."

49.    And, for patients who tested positive for COVID-19 – or who had COVID-19 antibodies in their system – additional blood testing was necessary to determine the potentially life-threatening damage that the virus was doing or had done to the body's organs and systems. As a result, in addition to the antibody testing specifically covered by the FFCRA and the CARES Act, these patients also received medically necessary comprehensive blood testing performed to determine the potentially life-threatening damage that the virus was doing or had done to the body's organs and systems. This blood testing includes checking for certain protein levels, vitamin levels, hormone levels, and other indicia that will provide key insights into the operation of various vital organs and systems.

50.    Along with the testing services described above, the Murphy Practice's clinical personnel provided telemedicine preventative medicine counseling and education to the patients, including how to observe universal precautions and proper nutrition during the pandemic, and other important issues, as specifically recommended by the Centers for Disease Control.

51.    Also, during the time period between the day the sample was taken and the results were available, the Murphy Practice's clinical personnel conducted telemedicine visits with the patients to check on their conditions and determine whether further medical intervention was needed. The frequency and duration of these visits was dependent on each patient's unique condition, with an emphasis and priority on following up with symptomatic patients suspected of being infected with the virus.

52.     Finally, when the results of the tests were available, the results were posted on the patient's individual registration portal. For positive tests a telemedicine visit was scheduled with the patient to review the results and next steps with a clinician.  The patient was advised to schedule an appointment to receive a comprehensive blood panel test. The purpose of this blood test, as discussed above, is to determine the potentially life-threatening damage that the virus was doing or had done to the body's organs and systems.

53.     The Murphy Practice unquestionably fulfilled its mission to provide ready access to COVID testing and related services to residents of southeastern Connecticut.  From March 1, 2020 through December 31, 2020, the Murphy Practice engaged in over 75,000 encounters with patients, and collectively tested and provided medical treatment and care to over 35,000 of those patients. To date, the Murphy Practice has provided COVID-19 testing to approximately 3,000 uninsured patients, without cost to the patients.

54.     The Murphy Practice has received accolades for its public health efforts from federal and state elected representatives, local government officials, and the media. Indeed, the Murphy Practice's efforts in creating the first walk up and/or drive through testing sites in Connecticut played a significant part in the relative success that Connecticut enjoyed in combating the COVID-19 crisis.

## THE REQUIREMENT THAT HEALTH PLANS
## COVER COVID-19 TESTING AND RELATED SERVICES

55.     In March of 2020 Congress, in recognition of the public health emergency and the desperate need to address it by making COVID-19 testing readily available to anyone who needed it, enacted two statues that addressed the issue of payment for testing:   the Families First Coronavirus Response Act ("FFCRA") and the CARES Act.

56.     Specifically, through the FFCRA Congress mandated that health plans and managed care companies, such as Yale's, must cover and reimburse providers for conducting COVID-19 testing, COVID antibody testing, and related testing and services.

57.     Moreover, in recognition of the emergency conditions, Congress went much further than merely requiring insurers to cover testing.   To make sure that no patient would be deterred from getting a COVID-19 test due to a concern for the cost, Congress required coverage for COVID-19 testing and related services to be provided without cost sharing, deductibles, copayments or coinsurance, or other medical management requirements.

58.     In essence, Congress sought to ensure that any patient with health insurance could get a COVID-19 test without any out-of-pocket costs, and without having to get permission from their insurer.

59.     Further, Congress addressed the possibility that a patient would have access to a COVID-19 test that was provided by practice that was not in the patient's insurance network.

60.     All healthcare providers are either "in-network" or "out-of-network" with respect to a particular insurance carrier. "In-network" or "participating" providers describes those who contract with a health insurer to accept discounted negotiated rates as payment in full for covered services.   The members typically can obtain services from an "in-network" provider at little or no cost to the member.

61.     "Out-of-network" or "non-participating" providers are those that do not have contracts with an insurance carrier to accept discounted rates and instead set their own fees for services.

62.     Guidance from the Departments of Labor, Health and Human Services and the Treasury has clarified that the FFCRA and the CARES Act apply to COVID-19 testing, antibody testing, and related services rendered by both "in-network" and "out-of-network providers."

63.     However, insurers typically seek to dissuade their members from using "out of network" providers, as a cost saving measure.  Some healthcare plans provide no "out of network" benefits at all, meaning that any services obtained from an "out of network provider" must be paid for by the patient.  Alternatively, many plans will pay only a percentage of "out of network" charges, leaving the patient responsible for the remainder.

64.     The FFCRA and the CARES Act addressed how insurers were required to reimburse both "in network" and out of "network providers."  In a section titled "ACCESS TO HEALTH CARE FOR COVID-19 PATIENTS," the CARES Act added a requirement that health plans covered by the FFCRA "shall reimburse the provider of the diagnostic testing as follows . . ." for covered tests and services.  The Act then set forth alternative methods to calculate the actual payment amounts health plans were required to pay providers for testing and related services.  Importantly, the Act addressed payment for services provided by "out of network" providers as well as "in network" providers.

65.     If the patient's plan already had a negotiated rate with the provider, i.e., the provider was "in-network," the plan had to pay that negotiated rate.

13

66.     Congress also addressed the potential problem of a patient who obtains a COVID test from an "out-of-network" provider.  Such a patient would ordinarily face the prospect of having to pay the full price to the provider, seek reimbursement from their insurer, and risk receiving no reimbursement, or at best partial reimbursement.

67.     However, the Act also addressed the payment requirements for providers who did not have a negotiated rate, i.e., "out-of-network providers."  Insurers are required to pay "out of network" providers their full cash price for the test, unless the insurer is able to negotiate a lower rate with the provider.

68.     Guidance has also confirmed that, in addition to reimbursing providers for the COVID tests, insurers must reimburse providers for other related items and services furnished during a visit that results in an order for a COVID-19 or COVID-19 antibody test.

69.     More recently, the CDC has specifically expressed its approval of tests that, like the BioFire Array, screen patients for influenza variants, along with COVID-19.

## YALE'S FAILURE TO FOLLOW THE LAW

70.     Sadly, however, Yale has not honored its obligation to reimburse the Murphy Practice for this vitally needed public health service. This is tragic, because, while it is virtually impossible in this polarized political environment for our federal elected officials to agree on anything, they did agree on payment for COVID-19 testing and related services.

71.     Beginning in or about March 2020, the Murphy Practice began providing COVID-19 testing to members of Yale's health plans through an arrangement with Yale and Yale Pathology Labs.

72.     In the early stages of the pandemic, Yale Pathology Labs, which is run by Yale Medical School, continuously sought to collaborate with the Murphy Practice, using the Murphy

Practice's samples, data and research to further their own COVID-19 testing procedures.[1] Initially, this relationship was exactly what Congress envisioned when drafting the COVID-19 testing provisions of the FFCRA and the CARES Act.

73.     Exhibit A to this Amended Complaint is a complete list of the Yale beneficiaries that presented to the Murphy Practice testing sites for COVID-19 testing and related services.

74.     Notably, the Murphy Practice often initially submitted a claim for reimbursement only for the BioFire Covid-19 test array, even if many of the medically necessary ancillary services described above were also provided.  Those tests and services were billed separately.

75.     After providing COVID-19 testing and related services to a beneficiary of Yale Health Plan, the Murphy Practice submitted its claim for reimbursement through its regular electronic claim processor, TriZetto Provider Solutions. On average, the delay between date of service and date of submission was between 30-60 days.

76.     Since Yale Health Plan apparently does not accept electronic claim submissions, TriZetto, after receiving the claim electronically from the Murphy Practice, printed out a paper copy of each claim when received and sent it by mail to Yale Health Plan.

77.     The Murphy Practice routinely monitored the status of each submitted claim through TriZetto's search claim history function. Through this function, the Murphy Practice was able to confirm that TriZetto had received the claim, printed it out, sent it to Yale Health Plan, and the Plan had accepted the claim.

78.     By the beginning of February 2021, Yale Health Plan still had not paid any of Yale Health Plan COVID-19 claims, notwithstanding that, for many of these claims, more than four

---

[1] https://yaledailynews.com/blog/2020/09/18/quality-remains-an-issue-in-citys-covid-19-racial-data/
https://pubmed.ncbi.nlm.nih.gov/33891875/

months had elapsed since submission. Accordingly, Murphy Practice staff reached out to Yale Health Plan to inquire about the outstanding claims.

79.     In response to the Murphy Practice's inquiry, Yale Health Plan stated – for the first time – that for some reason it could not accept claims from TriZetto. Accordingly, it asked the Murphy Practice to resend the (already accepted) claims directly to Yale Health Plan by mail.

80.     Thereafter, on February 15, 2021, Murphy Medical Associates resent a tranche of paper claims for COVID-19 testing directly to Yale Health Plan by mail

81.     In response to inquiries over the following six weeks, Yale Health Plan representatives repeatedly apprised the Murphy Practice that the claims were "in process."

82.     Then, on April 9, 2021, Ann Marie Morant, Claims & Referral Manager at Yale Health Plan reached out to the Murphy Practice, acknowledged receipt of over 100 claims, and asked to speak with someone in the Murphy Practice's billing department about those claims.

83.     On April 28, 2021, the Murphy Practice representatives had a conference call with Yale Health Plan representatives regarding the claims. At that conference, Yale Health Plan asked: (1) for paper copies of all claims directly sent to them for all outstanding claims; (2) the Murphy Practice's IRS Form W9 (needed for payment); and (3) a list of codes billed in the claims.

84.     The Murphy Practice provided the IRS Form W9 and the billed codes to Yale Health Plan by email on April 28, 2021.

85.     On May 4, 2021, the Murphy Practice sent the remaining paper copies to Yale Health Plan by mail.

86.     On May 17, 2021, the Murphy Practice learned that the Plan claimed it had never received the remaining paper copies. Accordingly, the Murphy Practice resent the papers to Yale that same day.

87.     The Murphy Practice thereafter provided Yale Health Plan with a receipt indicating that the Plan received the remaining paper copies on June 4, 2021.

88.     On June 11, 2021, Ann Marie Morant of the Yale Health Plan sent an email to the Murphy Practice personnel stating "I just wanted to let you know that when I came in today, I finally did receive the claims that were sent. I will need some time to look through them. I will keep you posted. Just as a FYI, I will be going on vacation as of next Friday and I will not be back until July 7th."

89.      After July 7, 2021, the Murphy Practice followed up with Yale Health Plan about the claims, and the Plan responded by scheduling a conference call between the Murphy Practice and Plan representatives on July 28, 2021.

90.     This started a dialog between representatives of the Murphy Practice and Yale Health Plan regarding these claims. These discussions continued throughout Fall 2021. As part of this dialog, Yale representatives sent the Murphy Practice's counsel a spreadsheet listing the claims that Yale Health Plan had received through September 2021. (Exhibit B)

91.     Despite receiving all of the claims, in multiple formats, and the supporting documentation in support of the claims, Yale flatly denied each and every claim submitted by the Murphy Practice for COVID-19 testing provided to Yale's beneficiaries.

92.     To date, the Murphy Practice has billed Yale approximately $1,100,784.00 for over 1500 claims relating to COVID-19 testing and related services provided to the aforementioned Yale members and/or beneficiaries.

93.     In response, Yale has failed to reimburse the Murphy Practice a single penny for providing this critical testing and related services during a public health crisis, after receiving the Murphy Practice's samples, data and research to further its own objectives.

## ERISA PLANS

94.     On information and belief, the patients the Murphy Practice treated were enrolled in Yale's health plans that were governed by the Employee Retirement Income Security Act ("ERISA").

95.     Even if the Families First Coronavirus Response Act and CARES Act did not, on their own, obligate Yale to reimburse the Murphy Practice for the medically necessary COVID-19-related testing that it performed – which they most certainly do – Yale would still be obligated to reimburse the Murphy Practice for the COVID-19-related testing and services rendered to patients enrolled in plans covered by ERISA. This is because the FFCRA and CARES Acts are to be treated, for enforcement purposes, as if they were included in ERISA.

96.     Further, the FFCRA and the CARES Act broadly apply to all health care plans, including ERISA plans, meaning that ERISA plans are required to cover COVID-19 testing and related services as provided in the FFCRA and the CARES Act.

97.     On information and belief, many of the ERISA plans that Yale provides and patients of the Murphy Practice were enrolled in provide benefits for medically necessary healthcare services plan beneficiaries obtain from "out of network" providers.

98.     In fact, Yale issues Summary of Benefits and Coverage materials on its website that outlining the benefits of Yale Health Plan for: (1) Student Coverage; (2) Clerical & Technical, Service and Maintenance Coverage; and (3) Managerial & Professional Staff and Faculty Coverage.[2]

99.     Interestingly, the Student Summary of Benefits fails to mention COVID-19 testing and related services altogether. Rather, with respect to coverage for Yale Students that submit to diagnostic testing, the Student Summary of Benefits states as follows:

---

[2] https://yalehealth.yale.edu/coverage (last accessed on May 15, 2023)

Preauthorization required for out-of-network care if non-emergency. Blood work is covered at in-network labs in New England only. If preauthorization is not obtained, service is not covered. *Id*.

100    The Clerical & Technical, Service and Maintenance Coverage Summary of Benefits state that "COVID-19 testing is covered at no charge both in-network and out-of-network."[3]

101    However, the Clerical & Technical, Service and Maintenance Coverage Summary of Benefits later goes on to state that "Preauthorization required for out-of-network care if non-emergency. If preauthorization is not obtained, service is not covered. Includes testing for COVID-19." *Id*.

102    Similarly, the Managerial & Professional Staff and Faculty Coverage Summary of Benefits state that "COVID19 testing is covered at no charge both in-network and out-of-network."[4]

103    However, the Managerial & Professional Staff and Faculty Coverage Summary of Benefits later goes on to state "Preauthorization required for out-of-network care if non-emergency. If preauthorization is not obtained, service is not covered. COVID19 testing is covered at no cost." *Id*.

104    The FFCRA and CARES Act effectively modified ERISA health plans to prohibit insurers or administrators of health plans, like Yale, from utilizing medical management or screening criteria to deny claims for COVID-19 testing and related services.

105    Instead, "[w]hen an individual seeks and receives a COVID-19 diagnostic test from a licensed or authorized health care provider, or when a licensed or authorized health care provider

---

[3] https://yalehealth.yale.edu/coverage/clerical-technical-service-maintenance-coverage (last accessed on May 15, 2023).
[4] https://yalehealth.yale.edu/coverage/managerial-professional-staff-and-faculty-coverage (last accessed on May 15, 2023)

refers an individual for a COVID-19 diagnostic test, plans and issuers generally must assume that the receipt of the test reflects an 'individualized clinical assessment' and the test should be covered without cost sharing, prior authorization, or other medical management requirements."[5]

106     On information and belief, Yale's blanket denials of the Murphy Practice's claims for COVID-19 testing, and unjustifiable records requests, violate the provisions of these ERISA plans and/or wrongfully deny benefits due under ERISA.

107     To the extent that any of Yale's ERISA plans do provide COVID-19 testing benefits as required by the FFCRA and the CARES Act, Yale has wrongfully failed to pay the Murphy Practice as required by the plans, and the FFCRA and the CARES Act, in violation of ERISA.

108     To the extent that any of Yale's ERISA plans have not followed the requirements of the FFCRA and CARES Act, and do not provide full coverage of COVID-19 testing services, they are in violation of the FFCRA, the CARES Act and ERISA.

109     The proper remedy for this violation is to interpret all ERISA plans as being consistent with the mandates of the FFCRA and the CARES Act – that is, to interpret these ERISA plans as providing the coverage of COVID-19 testing and related services that they are required to provide under the FFCRA and the CARES Act as incorporated into ERISA.

## ERISA ASSIGNMENTS OF BENEFITS

110     The Murphy Practice is "out-of-network" or non-participating with Yale or the health plans Yale administers.

111     Many of Yale's members who received testing services at the Murphy Practice locations executed assignments of benefits forms.  The assignment documents stated that each patient "assign to DMSOG/MMA[6] sufficient monies and/or benefits to which I may be entitled…

---

[5] FAQs Part 44 (February 26, 2021).
[6] Diagnostic Medical Specialists of Greenwich and Murphy Medical Associates.

for my medical care to cover costs of such care and treatment rendered to myself of dependent(s) by DMSOG/MMA. I further assign to DMSOG/MMA my right to commence a lawsuit under [ERISA] or other applicable state or federal law to recover such monies and/or benefits…This assignment includes, but is not limited to, the right to seek the equitable reformation of my health plan…"

112     Other patients registered electronically, and in the electronic forms that they completed they were advised and agreed that federal law requires their insurer to cover the entire cost of testing and related services, that the Murphy Practice would bill their insurer, and that the Murphy Practice would not, under any circumstances, seek payment from the patient.

113     Exhibit C to this Amended Complaint contains a true and accurate copy of the assignment of benefits and financial responsibility forms that Yale beneficiaries executed in favor of the Murphy Practice for COVID-19 testing and related services.

114     Upon information and belief, Yale's health plans do not prohibit members from assigning their rights to benefits, including direct payments, under the plan to the Murphy Practice, and/or designating an authorized representative to pursue claims and appeals on their behalf.

115     Even if some of Yale's plans prohibited such an assignment to the Murphy Practice, Yale waived the purported anti-assignment provisions and/or ratified them based on its course of dealing with and statements to the Murphy Practice and/or Dr. Murphy.

116     In fact, Yale had regular interaction and communication with the Murphy Practice and its representatives over a prolonged period - prior to and after the claim forms were submitted - without ever mentioning the Plan's anti-assignment clause during the Murphy Practice's attempt to engage in an administrative appeal process.

117     Moreover, the FFCRA and the CARES Act, by directing all plans, including ERISA plans, not just to cover COVID-19 testing and related services, but to pay providers certain amounts

for COVID-19 testing and related services provided to covered persons, have obviated the need for a provider to obtain a specific assignment of ERISA benefits from an ERISA beneficiary to be entitled to seek reimbursement from the plan for such testing and related services, or to be entitled to bring an action under ERISA for reimbursement or injunctive relief.

118     In effect, the FFCRA and the CARES Act have given providers of COVID-19 testing and related services standing to sue ERISA plans for violations of ERISA, including violations of the FFCRA and the CARES Act, regardless of whether there has been an assignment of benefits. Indeed, the "benefit" the Murphy Practice is suing for is the provider reimbursement required by the FFCRA and the CARES Act.  The FFCRA and the CARES Act do not merely require healthcare plans to "cover" COVID-19 testing, they require the plans to pay amounts directly to providers, because the Congressional intent was to prevent patients from facing any possible out of pocket liability.

119     Due to the above, Yale is prohibited from enforcing any purported anti-assignment provision in its members' plans since the terms of the FFCRA and CARES Act effectively modified health plans to include a direct assignment of benefits to a medical provider of COVID-19 testing and related services.

## YALE'S ERISA PROCEDURAL VIOLATIONS

120     Yale has repeatedly and persistently failed to comply with ERISA requirements in processing the claims submitted by the Murphy Practice.

121     Specifically, the United States Department of Labor has issued an ERISA claim regulation, setting forth the procedures ERISA-governed health plans, such as Yale, must follow when receiving, processing, adjudicating, determining, and resolving appeals on claims. This regulation is set forth at 29 C.F.R. § 2560.503-1.

122     For the services at issue in this lawsuit, the Murphy Practice, after rendering the covered and medically necessary services, timely and properly submitted claims for reimbursement to Yale in accordance with Yale's procedures and guidance, the ERISA claim regulation (29 C.F.R. § 2560.503-1), and federal law.

123     As alleged above, Yale's treatment of the Murphy Practice's claims at issue in this lawsuit was to either not pay the claims at all or ignore the very submission of the claims.

124     This treatment of the claims by Yale constituted "adverse benefit determinations" within the definition set forth at 29 C.F.R. § 2560.501-1(m)(4).

125     Under ERISA, Yale had an initial 30 days from receipt of a Murphy Practice claim to notify the Murphy Practice of an adverse benefit determination. 29 C.F.R. § 2560.501-1 (f)(2)(iii)(B).  Yale could extend this period, one time, for up to 15 days, provided that the Yale administrator determines that such an extension is needed due to matters beyond the control of Yale, and notifies the Murphy Practice, before the expiration of the initial 30 day period, of the circumstances requiring the extension of time and the date by which the plan expects to render a decision. *Id.*

126     Yale, in responding to the claims at issue in this litigation submitted by the Murphy Practice has never complied with either the 30-day time frame or the criteria for obtaining a 15-day extension.

127     In fact, as detailed in paragraphs 71 through 91, Yale never established an effective claims submission process to handle COVID-19 testing and related services claims for its members.

128     The ERISA claim regulation further required Yale, when denying the Murphy Practice's claims to provide: (a) the specific reason or reasons for the adverse determination; (b) reference to the specific plan provisions on which the determination is based; (iii) a description of

23

any additional material or information necessary for the claimant to perfect the claim and an explanation why such material or information is necessary; (iv) a description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under 29 U.S.C. § 1132(a); (v) if an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion, or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, and that a copy of such rule, guideline, protocol, or other similar criterion will be provided free of charge upon request; and (vi) if the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the medical circumstances at issue, or a statement that such explanation will be provided free of charge upon request. 29 C.F.R. § 2560.503-1(g)(1).

129    Yale woefully failed to comply with these requirements.

130    For denied claims pursuant to 29 U.S.C. § 1133, an ERISA plan must (a) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant; and (b) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim. 29 U.S.C. § 1133(1) and (2).

131    Yale has also violated 28 U.S.C 1133 and its related regulations by (a) refusing to describe any additional material or information necessary to perfect a claim, such as the appropriate diagnosis/treatment codes; (b) refusing to notify the relevant parties that they are entitled to have, free of charge, all documents, records and other information relevant to the claims for benefits; (c)

refusing to provide a statement describing any voluntary appeals procedure available, or a description of all required information to be given in connection with that procedure; (e) refusing to provide the Murphy Practice with the documents and information relevant to Yale's denial of the claims; and (f) refusing to timely issue required notifications that the claims have been denied or underpaid.

132    Yale's widespread non-compliance with ERISA regulations, and failure to provide any reasoning regarding its benefit denials has made participation in a fair administrative review process impossible.

133    More importantly, Yale's practices are specifically prohibited.  According to FAQs released on February 26, 2021, "The FFCRA prohibits plans and issuers from imposing medical management, including specific medical screening criteria, on coverage of COVID-19 diagnostic testing."

134    The FFCRA and CARES Act effectively modified ERISA health plans to prohibit insurers or administrators of health plans, like Yale, from utilizing medical management or screening criteria to deny claims for COVID-29 testing and related services.

135    Instead, "[w]hen an individual seeks and receives a COVID-19 diagnostic test from a licensed or authorized health care provider, or when a licensed or authorized health care provider refers an individual for a COVID-19 diagnostic test, plans and issuers generally must assume that the receipt of the test reflects an 'individualized clinical assessment' and the test should be covered without cost sharing, prior authorization, or other medical management requirements."[7]

---

[7] FAQs Part 44 (February 26, 2021).

136     The Murphy Practice complied with all of Yale's burdensome requests and provided documentation of the claims and patient spreadsheets that were generated to facilitate Yale's review. *See* Exhibits A & B.

137     Through this process, the Murphy Practice has appealed every claim which Yale has denied and, through that appeal process, sent Yale claims data and other supporting documentation.

138     Not once did Yale ever communicate that there was an additional appeal or some alternative administrative process that the Murphy Practice was required to follow to properly adjudicate these claims.

139     Under the ERISA claim regulation, Yale was required to issue a determination on any appeal of an adverse benefit determination within no more than 60 days from submission. 29 C.F.R. § 2560.503-1(i)(2).

140     As alleged above, Yale completely failed to honor this requirement. Indeed, to date, *two years later* in most circumstances, Yale has failed to provide any decision or final response to these submissions.

141     Due to the above, Yale has violated 29 U.S.C § 1133 29 C.F.R. § 2560.503-1.

142     Yale has denied each attempt by the Murphy Practice to appeal the nonpayment of these claims.

## ADMINISTRATIVELY APPEALING YALE'S RELEXIVE DENIAL OF EVERY CLAIM IS FUTILE

143     To date, the Murphy Practice has billed Yale approximately $1,100,784.00 for approximately 1,500 claims relating to COVID-19 testing and related services provided to members of Yale's health plans. (Exhibit "A").

144     Because Yale has reflexively denied every single claim for the exact same clearly reimbursable services, without providing any legitimate justification, appeal of these decisions would be futile.

145     Moreover, ERISA exhaustion is excused for the denials that were based on a general policy of denying all applications for a specific plan. This includes all of the denials for preauthorization services or any other medical management criteria.

146     ERISA exhaustion is also excused due to Yale's myriad failures, alleged above, to comply with the ERISA claim regulation.

147     Specifically, 29 C.F.R. § 2560.503-1(l)(1) provides that "in the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of [ERISA] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim." *Id.*

148     The Murphy Practice is not required to jump through procedural hoops on their way to an inevitable denial of coverage.

149     The Murphy Practice has exhausted available administrative remedies, or exhaustion of administrative remedies would be futile given the above, and, alternatively, Yale's utter disregard for ERISA deadlines and procedures excuses any failure to exhaust administrative remedies.

150     Futility is thus further demonstrated by Yale's unlawful measures to frustrate the Murphy Practice use of Yale's claims submission process. *See* paragraphs 71 through 91, *supra.*

151     Despite the above conduct and not receiving any meaningful reimbursement from Yale, the Murphy Practice has not and will not bill a member of Yale's health plans (or any patient for that matter) for any of the testing services.

152     Despite Yale's assertions, the Murphy Practice's policy against billing patients directly for COVID-19 testing and related services is in line with both the text and spirit of the FFCRA and the CARES Act.

## FIRST CAUSE OF ACTION
### (ERISA)

153.   Plaintiffs The Murphy Practice and Dr. Murphy repeat, reiterate, and re-allege each and every allegation contained above, as if more fully set forth at length herein.

154.   Yale's Health Plans at issue are benefit plans established pursuant to or governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et seq.

155.   The ERISA plans require Yale  to pay the cost of medically necessary covered healthcare services provided to Yale's Members and Beneficiaries.

156.   Yale's ERISA plans must provide coverage for COVID-19 related testing and services.

157.   Yale's ERISA plans provide for out-of-network benefits.

158.   The FFCRA and the CARES Act, as incorporated into ERISA, require the plans and Yale to cover COVID-19 related testing and services, and to reimburse providers for COVID-19 related testing and services.

159.   The Murphy Practice provided medically necessary covered healthcare services, COVID-19 related testing and services, to Yale's Members and Beneficiaries.

160.   The Murphy Practice properly billed Yale for covered COVID-19 related testing and related healthcare services provided to Yale's Members and Beneficiaries.

161.   The Murphy Practice was entitled to be reimbursed in full for providing COVID-19 related testing and related covered healthcare services to Yale's Members and Beneficiaries.

162.   Yale improperly and without justification failed to pay the Murphy Practice for the COVID-19 related testing and related covered healthcare services rendered to Yale's Members and Beneficiaries.

163.   29 U.S.C. § 1132 provides that a beneficiary of an ERISA Plan may bring a civil action to recover benefits due under the plan, to enforce rights under the plan and to clarify rights and future benefits under the plan.

164.   Yale's Members have assigned their right to receive benefits under the Plan to the Murphy Practice, either explicitly, by implication or by operation of law pursuant to the FFCRA and the CARES Act.

165.   The Murphy Practice has standing to bring this action regardless of the assignments, because the FFCRA and the CARES Act, by specifically directing insurers to pay providers particular amount for particular services, has given providers, including the Murphy Practice, standing to sue ERISA plans for violations of the acts.

166.   The Defendant's failure to pay the Murphy Practice in full for the covered healthcare services rendered to the Members constitutes a breach of the Plans, either as written or as equitably reformed to comply with the FFCRA and the CARES Act, and Yale's failure was erroneous, arbitrary and capricious and was without reason, was unsupported by substantial evidence and was erroneous as a matter of law.

167.   Because Yale has reflexively denied thousands of claims for the exact same clearly reimbursable services, without providing any legitimate justification, appeal of these decisions would be futile.

29

168.    Because Yale had a general policy of denying claims for preauthorization and medical management criteria, appeal of those decisions would be futile.

169.    The Murphy Practice has exhausted available administrative remedies, or exhaustion of administrative remedies would be futile given the above, and, alternatively, Yale's utter disregard for ERISA deadlines and procedures excuses any failure to exhaust administrative remedies.

170.    The Murphy Practice is entitled to payment, pursuant to the FFCRA and the CARES Act as incorporated into ERISA for the medically necessary COVID-19 related testing and services provided to Yale's Members and Beneficiaries.

171.    The Murphy Practice is also entitled to reasonable attorneys' fees, pursuant to 29 U.S.C. § 1132 (g)(1).

172.    By reason of the foregoing, Plaintiffs have been damaged and are entitled to a judgment against Yale in the amount of at least $1,100,784.00 for approximately 1,500 claims relating to COVID-19 testing and related services provided to members of Yale's health plans, plus interest and attorneys' fees.

173.    The Murphy Practice is also entitled to declaratory relief to enforce the terms of Yale's ERISA health plans and to clarify its right to future benefits under such plans.

**WHEREFORE**, Plaintiffs demand judgment as follows:

a)    On the First Count, a judgment against Yale, awarding the Murphy Practice compensatory damages in an amount to be determined at trial, such amount being no less than $1,100,784.00, plus Plaintiffs' costs and reasonable attorney's fees, plus pre-judgment and post-judgment interest; and

b)    Such other and further relief as the Court may deem equitable, just and proper.

Dated: New Haven, Connecticut
       May 15, 2023

                              **HARRIS BEACH PLLC**
                              *Attorneys for Plaintiffs*


                              By: /s/ Roy W. Breitenbach
                                  Roy W. Breitenbach
                                  Daniel S. Hallak
                              The Omni
                              333 Earle Ovington Boulevard, Suite 901
                              Uniondale, New York 11553
                              (516) 880-8484

                              195 Church Street, #18
                              New Haven, Connecticut 06510
                              (203) 784-3159